# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 24-CR-4065-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| OMAR BARRIENTOS, | |
| Defendant. | |

Defendant Omar Barrientos moves to suppress evidence seized during an encounter with officers on June 20, 2024. Doc. 38. The Government resists. Doc. 41. I held an evidentiary hearing on March 18, 2025. Doc. 44. At the hearing, the following witnesses testified:

- Officer Joshua Fleckenstein, Sioux City Police Department;
- Officer Colin Scherle, Sioux City Police Department; and
- Retired Officer Aaron Clark, with the Sioux City Police Department at the time of the events at issue.

I also admitted the following exhibits into evidence:

- Exhibit A (Doc. 38-2) – Officer Fleckenstein's body camera video;
- Exhibit B (Doc. 38-3) – Officer Fleckenstein's dash camera video; and
- Exhibit C (Doc. 38-4) – Officer Scherle's body camera video.

I recommend **denying** the motion to suppress (Doc. 38).

## I. BACKGROUND[1]

---

[1] The facts in the background section are taken from the testimony at the suppression hearing unless otherwise noted.

Around 6:50 a.m. on June 20, 2024, the Sioux City Police Department received a call for service from a local business about a person sleeping in a parked vehicle in their parking lot. The business wanted the vehicle moved. Officer Fleckenstein responded, arriving at 6:56 a.m., and parked behind the vehicle (a Honda Accord). *See* Ex. A at 06:56.[2] The Accord was not parked in a designated parking spot; its four doors were closed, but the driver's side window was rolled down. Officer Fleckenstein found the sole occupant (later identified as Defendant Barrientos) asleep in the front passenger seat. Officer Fleckenstein said hello and knocked on the side of the car a couple of times before Barrientos woke up. Officer Fleckenstein asked Barrientos what he was doing in the parking lot. He testified that Barrientos had slurred speech and was incoherent. Officer Fleckenstein described the interaction as "strange." In response to Officer Fleckenstein asking what Barrientos was doing there, Barrientos said something about a wire for a computer; and when Officer Fleckenstein said, "you're here for a computer?" Barrientos said something about computers being green. Ex. A at 06:56. Officer Fleckenstein asked Barrientos for identification, and Barrientos tried handing him a debit card. Ex. A at 06:57:25. Officer Fleckenstein noted he had handed him a debit card and asked if he had an ID; Barrientos suggested he did. After Barrientos tried again and produced a different debit card, Officer Fleckenstein decided to obtain his name and other information verbally.[3] With prodding, Barrientos was ultimately able to provide his name, date of birth, phone number, and address. Ex. A at 06:58.

---

[2] The times listed for Exhibit A come from the time stamp in the video; the times listed for Exhibits B and C come from the counter on the media player.

[3] Officer Fleckenstein explained in the video exhibit that Barrientos tried to give him two debit cards but no identification. Ex. A at 07:14:40.

Officer Fleckenstein noticed a tattoo near Barrientos's left elbow with the initials "WSL," which he believed referred to a street gang named the West Side Locos. When Barrientos told Officer Fleckenstein his name, Officer Fleckenstein recalled a prior case he investigated where Barrientos was the suspect in a violent stabbing.[4] At this point, Officer Fleckenstein requested back up (Ex. A at 06:58) because he was not comfortable leaving Barrientos unattended in the Accord without another officer present. Officer Fleckenstein also asked dispatch to run Barrientos for any active arrest warrants (he had none).[5]

Officer Scherle arrived and parked in front of the Accord. Ex. A at 07:01:06. His normal practice as back up is to park in front of the vehicle to block it so it cannot be driven away or used as a weapon against officers. He testified that when he saw that the sole occupant was in the passenger seat, he parked further back—he estimated he parked 7 to 10 feet from the Accord. The videos show that he parked closer than that, the front of his vehicle 2 to 3 feet from the front of the Accord (although the Accord still had space to maneuver around Officer Scherle's vehicle). *See* Ex. C at 05:42. Officer Fleckenstein's vehicle was parked about a car's length behind the Accord. Ex. C at 05:03. The patrol vehicles and the Accord were parked in a line parallel to a fence (on the passenger sides of the Accord and Officer Fleckenstein's vehicle, and on the driver's side of Officer Scherle's vehicle), with a lane of parking lot at least as wide as a car in

---

[4] Officer Fleckenstein later recounted to Officer Scherle that Barrientos had a WSL tattoo on his arm and that he had stabbed someone in the past. Ex. A at 07:12:35.

[5] At the hearing, Officer Fleckenstein could not recall if he asked dispatch to run this information or if he checked it on his in-car computer. The video shows he requested the information over channel two (Ex. A at 06:59:34); Officer Scherle testified records checks were done on channel two.

between the cars and the fence. Ex. C at 00:35. To the left of the Accord (on the driver's side) was open parking lot.

Officer Fleckenstein told Officer Scherle that the call for service was to remove the person from the property, that he was not sure what was going on—he did not smell alcohol or marijuana, but Barrientos had terrible dexterity and speech—and that he was going to go figure something out. Ex. A at 07:01:25. Officer Fleckenstein went to his patrol vehicle and looked up information on his computer. He did not believe Barrientos could safely drive or walk away, based on his slurred speech, incoherence, poor dexterity, lethargy, body movements, and the Accord being parked in an odd position. Officer Fleckenstein testified that he tried to find someone to come and get the vehicle and give Barrientos a ride. He looked up the owner of the Accord and searched for persons associated with Barrientos. He made one phone call but no one answered, and he was not able to locate any other numbers to call. In all, this process took approximately five minutes.[6] Ex. A at 07:01:30 to 07:06:52. Officer Fleckenstein did not ascertain if Barrientos had a cell phone at that point, nor did he ask him about calling someone to give him a ride or request a cab or Uber.

In the meantime, Officer Scherle went to the passenger door and spoke with Barrientos, trying to learn his origin and destination. He asked Barrientos his name (he responded "Omar") and who the car belonged to (Barrientos was not able to say—it appears that he said his girlfriend and then said a rental). Ex. C. at 00:54. Around this time, a third officer arrived on scene, Officer Aaron Clark, parking parallel to Officer Scherle's vehicle with the space of several car widths in between (and not blocking the

---

[6] Officer Fleckenstein also learned that Barrientos had a lengthy criminal history and was on parole. Ex. A at 07:12:35.

exit, although the Accord would have had to drive in between two patrol vehicles to reach the nearest exit).[7]

Officer Scherle asked Barrientos if he had taken anything, and Barrientos said no. Ex. C at 01:45. Barrientos said he was trying to get a ride. Ex. C at 02:00. He asked what the problem was, and Officer Scherle said that Barrientos was trespassing and clearly out of it and that he didn't even know whose car he was in. Ex. C at 02:28. Barrientos explained he was from the area and was just waiting. Ex. C at 02:40. Officer Scherle pointed out that Barrientos did not know who the Accord belonged to, and Barrientos did not answer. Ex. C at 02:51. Based on his observations of Barrientos—furtive movements, twitching, sweating profusely, and fidgeting—Officer Scherle believed Barrientos was under the influence of narcotics.[8] He did not believe Barrientos could operate a vehicle safety in that condition.

Officer Scherle told Barrientos not to reach for anything (Barrientos started to get in the glove box after Officer Scherle asked again who the vehicle belonged to). Ex. C at 03:02. Officer Scherle had safety concerns based on Barrientos's behavior and gang or prison tattoos. Officer Scherle later told Officer Fleckenstein that Barrientos's behavior was freaking him out. Ex. C at 06:47. Once Officer Clark had exited his vehicle and come to the driver's side window, Officer Scherle said, "I tell you what,

---

[7] Normally, only one officer responds to a request for back up. Officer Fleckenstein's call for service occurred during the shift change for the police department. Officer Scherle responded as he was ending his shift, and Officer Clark responded as he and Officer Fleckenstein were the two "early cars" for the shift just starting (two vehicles start patrol for the new shift while the rest of the officers are in roll call).

[8] All three officers on scene had general training on impaired driving. Officer Scherle had additional training in drug interdiction and had certification in Advanced Roadside Detection and Enforcement (ARIDE). None of the officers were certified as drug recognition experts (to examine impaired drivers and give an opinion about whether they were under the influence of drugs and if so, which category).

5

Omar, just do me a favor, just hop out and keep your hands where I can see them, okay?" Ex. C at 03:10 to 03:59. Officer Scherle directed Barrientos to place his hands on the vehicle so he could conduct a pat-down search (Barrientos was slow putting his hands on the Accord when asked). *Id.*; Ex. B at 08:57. Officer Scherle found no weapons or contraband and told Barrientos to wait with his hands on the car (he was again slow to do so) and then go sit on the front bumper of Officer Fleckenstein's vehicle with Officer Clark standing by. Ex. B at 10:40; Ex. C at 03:58 to 05:11. Officer Scherle went back to the Accord and looked in the passenger side (the doors were closed and windows up). Ex. C at 05:13. He saw a sleeve of pills in the center console area, which he believed could be the cause of Barrientos's impairment, either prescription or illegal narcotics. The pills were in a silver foil blister pack and appeared to be commercially packaged. Officer Scherle opened the front passenger door and picked up the pill sleeve. Ex. B at 11:07; Ex. C at 05:28. Upon seeing they were caffeine pills, he tossed them onto the passenger seat of the car and stepped back, continuing to peer into the car's open door with his flashlight for a few seconds. Ex. C at 05:30; Ex. A at 07:00. Although Officer Scherle testified at the suppression hearing that he shut the door after returning the pills, the video exhibits show he walked around to the driver's side of the Accord without shutting the passenger side door. Ex. B at 11:25.

Officer Scherle peered into the open driver's side window with his flashlight for a few seconds before indicating he saw a "crystalline substance on the driver's side floorboard" he believed to be methamphetamine. Ex. C at 05:49. Neither Officers Fleckenstein nor Clark saw it prior to this, even though both had been at the driver's side window. Officer Fleckenstein had been at the driver's side window only when first engaging with Barrientos, and he acknowledged on scene that he was "focused on [Barrientos]" and "didn't even see" the shards of methamphetamine. *See* Ex. A at 06:56-07:01, 07:11:30. Officer Clark had peered through the open driver's side window

6

without a flashlight for about fifteen seconds while Officer Scherle was questioning Barrientos (when the passenger door was still closed). Ex. B at 07:32-07:46.

Officer Scherle went to his vehicle to get a field test kit. Ex. B at 11:41. As Officer Scherle went back to the Accord, Officer Fleckenstein returned. Ex. B at 12:00; Ex. C at 06:28. Officer Scherle opened the driver's side door of the Accord, and the white substance can be clearly seen on the body camera video, along the edge of the foot mat (both doors were open at this time). Ex. C at 7:18. The substance tested positive for methamphetamine. Officer Scherle then began searching the vehicle for drugs and almost immediately found suspected methamphetamine under the front passenger seat. Ex. B at 13:00; Ex. C at 07:19 to 07:25. After that, Officer Scherle placed Barrientos under arrest.

## II. DISCUSSION

Barrientos agrees the initial encounter with Officer Fleckenstein was a lawful, consensual encounter. He argues the situation transitioned to an unlawful detention when additional officers arrived and the encounter was unreasonably prolonged. Barrientos also challenges the search of his vehicle, arguing that the caffeine pills were not plainly incriminating and that opening the passenger door to retrieve the caffeine pills tainted the subsequent plain-view search based on Officer Scherle seeing methamphetamine near the driver's floor mat.

### A. Seizure

"In *Terry v. Ohio*,[9] the Supreme Court held officers may conduct brief investigatory stops of individuals if they have a reasonable articulable suspicion of

---

[9] 392 U.S. 1, 30 (1968).

7

Case 5:24-cr-04065-LTS-KEM    Document 45    Filed 04/09/25    Page 7 of 16

criminal activity."[10] Reasonable suspicion requires more than a hunch that criminal activity is afoot.[11] "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a *Terry* stop."[12]

"[N]ot all personal contacts between law enforcement officers and citizens constitute 'seizures' for Fourth Amendment purposes," and a consensual encounter does not require reasonable suspicion.[13] "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[14] Law enforcement may "approach[] individuals on the street or in other public places and put[] questions to them if they are willing to listen," and the encounter is considered consensual (and does not require reasonable suspicion) "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.'"[15] When determining whether a reasonable person would feel free to leave, the Eighth Circuit has identified several nonexhaustive factors to consider:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating

---

[10] *United States v. Griffith*, 533 F.3d 979, 983-84 (8th Cir. 2008).

[11] *Id.* at 984.

[12] *Id.*

[13] *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

[14] *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

[15] *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002); *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.[16]

"There is no bright line between a consensual encounter and a *Terry* stop, rather, the determination is a fact intensive one which turns upon the unique facts of each case."[17]

Here, Barrientos argues that the consensual encounter transformed into a seizure at some point—when Officer Scherle arrived and parked nose-to-nose with his car, which would have required Barrientos to reverse to maneuver out and leave; when a third officer arrived on the scene; or when Officer Scherle asked him to step out of the vehicle for a *Terry* pat down and then directed him to sit on the bumper of a patrol vehicle.[18] But by the time any of these events occurred, law enforcement had a reasonable, articulable suspicion that Barrientos was intoxicated (or otherwise unable to drive) based on his slurred speech and incoherent answers to questions.

Separate and apart from their duty to investigate crimes, law enforcement perform "community caretaking functions."[19] Thus, officers "may briefly detain an individual to ensure her safety and that of the officers or the public" when reasonable to do so.[20] "Noninvestigatory seizures are reasonable if they are 'based on specific articulable facts'

---

[16] *United States v. Villa-Gonzalez*, 623 F.3d 526, 532-33 (8th Cir. 2010) (citations omitted) (quoting *Griffith*, 533 F.3d at 983).

[17] *United States v. Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998).

[18] In his initial brief, Barrientos additionally argued he was seized because law enforcement retained his identification card; at the hearing, Barrientos conceded that he provided law enforcement only with debit cards, which they immediately returned.

[19] *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

[20] *United States v. Conley*, 69 F.4th 519, 524 (8th Cir. 2023) (quoting *Graham v. Barnette*, 5 F.4th 872, 885 (8th Cir. 2021)).

9

and the 'governmental interest' in effecting the seizure in question 'outweighs the individual's interest in being free from arbitrary government interference.'"[21]

The Eighth Circuit has upheld a brief detention of an intoxicated individual to ensure the individual's safety and that of others.[22] As the Eighth Circuit has recognized, police officers have faced liability for permitting "a severely intoxicated woman to walk a third of a block to her home," when the woman "passed out in a ditch and suffered hypothermia and brain damage"; and for permitting an "intoxicated passenger to remain with the vehicle" after the driver's arrest, when the passenger "then assumed control of the vehicle and took police on a high speed chase that ultimately resulted in a fatal car crash."[23]

> These cases illustrate the fine line that police officers must walk in dealing with intoxicated individuals. Police officers are often constitutionally obligated to care for those individuals, and because alcohol [or drugs] can have disparate effects on different people, police officers must be given some latitude in evaluating whether an intoxicated individual can properly care for herself.[24]

---

[21] *Id.* (quoting *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014)).

[22] *Graham*, 5 F.4th at 885 (recognizing court had previously upheld in *Winters* "a brief detention of an intoxicated individual under the community-caretaking exception and analogiz[ed] the officers' decision to 'investigate' and 'briefly detain' to investigative stops"); *Winters v. Adams*, 254 F.3d 758, 760-61, 764 (8th Cir. 2001) (officers had received a tip that a person was seen stumbling around their car, and when officers arrived on the scene, the person was sitting in the driver's seat with the car off, said he was waiting on a push start, and refused to otherwise engage with officers; the court held officers were not "required simply to walk away . . . , thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens" (footnote omitted)).

[23] *Meehan v. Thompson*, 763 F.3d 936, 944 (8th Cir. 2014).

[24] *Id.*

Here, Officer Fleckenstein found Barrientos sleeping in the passenger seat in his car, stopped in no identifiable parking spot in the parking lot of a business that wanted the car removed. After speaking with Barrientos, Officer Fleckenstein did not believe it would be safe for Barrientos to drive, so he did not ask him to move the car.[25] Officer Fleckenstein also had concerns about allowing Barrientos to walk away from the scene alone, given his level of impairment (for example, Barrientos was unable to recognize that he was providing law enforcement with debit cards rather than his driver's license). Under the circumstances, it was reasonable for Officer Fleckenstein to detain Barrientos while he tried to figure out how to safely remove Barrientos and his vehicle from the premises.

I recommend rejecting Barrientos's argument that he was unlawfully seized in violation of the Fourth Amendment.

## B. Search

Barrientos also challenges the search of his vehicle. Officer Scherle observed pills in a silver foil blister pack in the cupholder of Barrientos's vehicle, after which he opened the passenger door of the vehicle and seized the pills (constituting a search).

The automobile exception allows the search of cars without a warrant based on probable cause.[26] "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or

---

[25] Because Barrientos had not been asked to leave, he did not commit criminal trespass under Iowa law, which is defined as "remaining upon . . . property without justification after being notified or requested . . . to remove or vacate therefrom by . . . any peace officer." **Iowa Code § 716.7(2)(a)(2)**.

[26] *United States v. Mims*, 122 F.4th 1021, 1032 (8th Cir. 2024).

evidence of a crime would be found in a particular place."[27] Under the plain-view doctrine, an officer may "seize an object without a warrant if (1) the officer lawfully arrived at the location from which he or she views the object, (2) the object's 'incriminating character' is 'immediately apparent'"—that is, officers have "probable cause to associate it with criminal activity"—"and (3) 'the officer has a lawful right of access to the object itself.'"[28] Barrientos argues that the incriminating nature of the pills was not immediately apparent, as they appeared to be commercially packaged, legal drugs. In *Arredondo*, the Eighth Circuit held that when law enforcement were performing a welfare check in a house with drunk individuals, the plain-view doctrine did not justify an officer picking up a "small clear medicine vial" in plain view and turning it around "to read the label," as the officer "had no idea of the contents," and the "small glass container[] . . . looked similar to [noncontraband] containers that hold common household items, such as contact lenses, essential oils, or medications for insulin or fertility."[29] Here, as in *Arredondo*, the pills were not plainly illegal drugs or contraband.

The Government argues that the search was reasonable, as the pills could have caused Barrientos's intoxication, even if they were prescription drugs obtained legally. But what authorized law enforcement to search for the source of Barrientos's intoxication? Barrientos was not so intoxicated that finding the source seemed required for his safety, such as to determine the proper treatment for an unconscious individual.[30]

---

[27] *Id.* (quoting **United States v. Fladten**, 230 F.3d 1083, 1085 (8th Cir. 2000)).

[28] **United States v. Arredondo**, 996 F.3d 903, 907 (8th Cir. 2021) (quoting **United States v. Lewis**, 864 F.3d 937, 943 (8th Cir. 2017)).

[29] *Id.* at 906-07.

[30] Barrientos gave some nonsensical answers to officers' questions, and he twice confused his debit cards with his driver's license. Ultimately, however, he was able to provide officers with some identifying information about himself. Officers (rightly) appeared concerned with

12

And it is questionable whether officers had probable cause that Barrientos had committed a crime simply because he was intoxicated (such that the pills could be seized as potential evidence of the crime). Law enforcement did not have probable cause that Barrientos had violated Iowa's bar on public intoxication,[31] as Iowa courts have held a private vehicle is a not a public place.[32] It was also unclear whether Barrientos had driven to the parking lot in an intoxicated state, or whether he had become intoxicated after arriving there, given that officers discovered him asleep in the passenger seat (although the car was parked outside of any parking lot lines).

I need not resolve the reasonableness of the search for the caffeine pills, however. I do not find that the search of the caffeine pills, even if unlawful, requires suppression of the methamphetamine later found as the result of a plain-view search. The Supreme Court has recognized three exceptions to the exclusionary rule involving "the causal relationship between the unconstitutional act and the discovery of evidence":

> First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. Third . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the

---

Barrientos's ability to care for himself if left alone without a car, but they did not contact medical professionals or otherwise indicate Barrientos needed medical treatment.

[31] **Iowa Code § 123.46(2)**.

[32] ***State v. Lake***, 476 N.W.2d 55, 56-57 (Iowa 1991).

13

constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."[33]

I find that either the independent-source or inevitable-discovery doctrine applies here.

Both the independent-source and inevitable-discovery rules require that "the evidence would have been acquired by lawful means had the unlawful search not occurred."[34]

> The independent-source doctrine applies if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact *was* acquired (or reacquired) by these lawful means. The inevitable-discovery doctrine, on the other hand, applies if the evidence would have been acquired by lawful means had the unlawful search not occurred but in fact *was not* acquired (or reacquired) by these lawful means. Although the distinction between the independent-source and inevitable-discovery doctrines is not sharp, where exactly one draws the line between the two doctrines is unimportant. Underlying both doctrines is the principle that, "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." Provided that the evidence would have been acquired lawfully if the unlawful search had not occurred, admitting the evidence puts the government in the same position that it would have occupied if the unlawful search had not occurred. This is true regardless [of] whether the evidence in fact *was* (re)acquired lawfully—and thus whether the appropriate exception to invoke is the independent-source doctrine rather than the inevitable-discovery doctrine.[35]

Some Eighth Circuit cases suggest that for the inevitable-discovery rule to apply, the Government must prove by a preponderance of the evidence that law enforcement were "actively pursuing a substantial, alternative line of investigation at the time of the

---

[33] *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (citations omitted) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

[34] *United States v. Baez*, 983 F.3d 1029, 1036-37 (8th Cir. 2020).

[35] *Id.* at 1037 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

14

constitutional violation," although recent cases have called this requirement into question.[36] To the extent an "alternative line of investigation" is needed, it has been interpreted broadly, requiring only that officers "have in mind 'an alternative plan' that they would have executed if the constitutional violation had not occurred."[37]

Here, I find that opening the passenger car door to search for the caffeine pills had no effect on Officer Scherle's subsequent plain-view search. When Officer Scherle realized the caffeine pills were not a source of intoxication, he put them back and walked around the car to the driver's side. By shining his flashlight through the open driver's side window (something neither of the other officers had done previously), he was able to immediately see a white substance that looked like methamphetamine on the floor of the driver's seat. The Fourth Amendment did not prohibit Officer Scherle from standing outside the driver's side window and looking through the window with his flashlight, and I do not find that the open passenger door affected his ability to see the methamphetamine in plain view. Officer Scherle's actions demonstrate that even if he had not opened the passenger door to seize the caffeine pills, he would have continued to look for any contraband in plain view and discovered the methamphetamine in the car—indeed, he did so. Because Officer Scherle intended to continue to look for sources of intoxication in plain view at the time of the (assumed unlawful) caffeine-pills search, he was pursuing an alternative line of investigation. The plain view of the methamphetamine constituted an independent reason for probable cause to exist to search the car, unaffected by the prior caffeine-pills search.

---

[36] *See Baez*, 983 F.3d at 1039 (collecting cases and noting inconsistent standard); *see also **United States v. Thomas***, 524 F.3d 855, 861-62 (8th Cir. 2008) (Colloton, J., concurring, joined by Benton, J.) (noting problems with circuit standard rendering it inconsistent with Supreme Court precedent).

[37] *Baez*, 983 F.3d at 1040.

15

I recommend rejecting Barrientos's argument that any illegality in opening the passenger door to seize the caffeine pills requires suppression of the methamphetamine.

### III. CONCLUSION

The court recommends **DENYING** Defendant Barrientos' motion to suppress (Doc. 38).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[38] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[39] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[40]

**DATED** April 9, 2025.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[38] **LCrR 59**.

[39] *See* **Fed. R. Crim. P. 59**.

[40] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).