# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR24-4065-LTS-KEM |
| vs. | |
| OMAR BARRIENTOS, | **ORDER ON REPORT AND RECOMMENDATION** |
| Defendant. | |

This matter is before me on a Report and Recommendation (R&R) (Doc. 45) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny defendant Omar Barrientos' motion (Doc. 38) to suppress evidence. Barrientos has filed objections (Doc. 48) and the Government has filed a response (Doc. 49).

## I.   BACKGROUND

Barrientos is charged in an indictment (Doc. 2) with one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 851.  He seeks the exclusion of evidence obtained during an encounter with law enforcement officers on June 20, 2024.  The Government resists.  Doc. 41.

Judge Mahoney held an evidentiary hearing on March 18, 2025. Doc. 44. The Government called Officers Joshua Fleckenstein, Colin Scherle and Aaron Clark as witnesses.  Doc. 45 at 1.  Judge Mahoney also admitted the following exhibits: (1) Fleckenstein's body camera video (Doc. 38-2, Ex. A); (2) Fleckenstein's dash camera video (Doc. 28-3, Ex. B) and (3) Scherle's body camera video (Doc. 38-4, Ex. C).  Doc. 45 at 1,  She issued her R&R (Doc. 45) on April 9, 2025, and Barrientos filed his objections (Doc. 48) on April 23, 2025.  Trial is scheduled to begin on June 16, 2025.

## II. THE R&R

### A. *Findings of Fact*

Judge Mahoney made the following findings of fact:[1]

Around 6:50 a.m. on June 20, 2024, the Sioux City Police Department received a call for service from a local business about a person sleeping in a parked vehicle in their parking lot. The business wanted the vehicle moved. Officer Fleckenstein responded, arriving at 6:56 a.m., and parked behind the vehicle (a Honda Accord). *See* Ex. A at 06:56. The Accord was not parked in a designated parking spot; its four doors were closed, but the driver's side window was rolled down. Officer Fleckenstein found the sole occupant (later identified as Defendant Barrientos) asleep in the front passenger seat. Officer Fleckenstein said hello and knocked on the side of the car a couple times before Barrientos woke up. Officer Fleckenstein asked Barrientos what he was doing in the parking lot. He testified that Barrientos had slurred speech and was incoherent. Officer Fleckenstein described the interaction as "strange." In response to Officer Fleckenstein asking what Barrientos was doing there, Barrientos said something about a wire for a computer; and when Officer Fleckenstein said, "you're here for a computer?" Barrientos said something about computers being green. Ex. A at 06:56. Officer Fleckenstein asked Barrientos for identification, and Barrientos tried handing him a debit card. Ex. A at 06:57:25. Officer Fleckenstein noted he had handed him a debit card and asked if he had an ID; Barrientos suggested he did. After Barrientos tried again and produced a different debit card, Officer Fleckenstein decided to obtain his name and other information verbally. With prodding, Barrientos was ultimately able to provide his name, date of birth, phone number, and address. Ex. A at 06:58.

Officer Fleckenstein noticed a tattoo near Barrientos's left elbow with the initials "WSL," which he believed referred to a street gang named West Side Locos. When Barrientos told Officer Fleckenstein his name, Officer Fleckenstein recalled a prior case he investigated where Barrientos was the suspect in a violent stabbing. At this point, Officer Fleckenstein requested back up (Ex. A at 06:58) because he was not comfortable leaving Barrientos unattended in the Accord without another officer present. Officer Fleckenstein also asked dispatch to run Barrientos for any active arrest warrants (he had none).

---

[1] Barrientos makes no objections to the findings of fact. I have reviewed them for clear error and found none. As such, I adopt them without modification.

Officer Scherle arrived and parked in front of the Accord. Ex. A at 07:01:06. His normal practice as back up is to park in front of the vehicle to block it so it cannot be driven away or used as a weapon against officers. He testified that when he saw that the sole occupant was in the passenger seat, he parked further back – he estimated he parked 7 to 10 feet from the Accord. The videos show that he parked closer than that, the front of his vehicle 2 to 3 feet from the front of the Accord (although the Accord still had space to maneuver around Officer Scherle's vehicle). *See* Ex. C at 05:42. Officer Fleckenstein's vehicle was parked about a car's length behind the Acord. Ex. C at 05:03. The patrol vehicles and the Accord were parked in a line parallel to a fence (on the passenger sides of the Accord and Officer Fleckenstein's vehicle, and on the driver's side of Officer Scherle's vehicle), with a lane of parking lot at least as wide as a car in between the cars and the fence. Ex. C at 00:35. To the left of the Accord (on the driver's side) was open parking lot.

Officer Fleckenstein told Officer Scherle that the call for service was to remove the person from the property, that he was not sure what was going on – he did not smell alcohol or marijuana, but Barrientos had terrible dexterity and speech – and that he was going to go figure something out. Ex. A at 07:01:25. Officer Fleckenstein went to his patrol vehicle and looked up information on his computer. He did not believe Barrientos could safely drive or walk away, based on his slurred speech, incoherence, poor dexterity, lethargy, body movements, and the Accord being parked in an odd position. Officer Fleckenstein testified that he tried to find someone to come and get the vehicle and give Barrientos a ride. He looked up the owner of the Accord and searched for persons associated with Barrientos. He made one phone call but no one answered, and he was not able to locate any other numbers to call. In all, this process took approximately five minutes. Ex. A at 07:01:30 to 07:06:52. Officer Fleckenstein did not ascertain if Barrientos had a cell phone at that point, nor did he ask him about calling someone to give him a ride or request a cab or Uber.

In the meantime, Officer Scherle went to the passenger door and spoke with Barrientos, trying to learn his origin and destination. He asked Barrientos his name (he responded "Omar") and who the car belonged to (Barrientos was not able to say – it appears that he said his girlfriend and then said a rental). Ex. C. at 00:54. Around this time, a third officer arrived on scene, Officer Aaron Clark, parking parallel to Officer Scherle's vehicle with the space of several car widths in between (and not blocking

3

the exit, although the Accord would have had to drive in between two patrol vehicles to reach the nearest exit).

Officer Scherle asked Barrientos if he had taken anything, and Barrientos said no. Ex. C at 01:45. Barrientos said he was trying to get a ride. Ex. C at 02:00. He asked what the problem was, and Officer Scherle said that Barrientos was trespassing and clearly out of it and that he didn't even know whose car he was in. Ex. C at 02:28. Barrientos explained he was from the area and was just waiting. Ex. C at 02:40. Officer Scherle pointed out that Barrientos did not know who the Accord belonged to, and Barrientos did not answer. Ex. C at 02:51. Based on his observations of Barrientos – furtive movements, twitching, sweating profusely, and fidgeting – Officer Scherle believed Barrientos was under the influence of narcotics. He did not believe Barrientos could operate a vehicle safe[l]y in that condition.

Officer Scherle told Barrientos not to reach for anything (Barrientos started to get in the glove box after Officer Scherle asked again who the vehicle belonged to). Ex. C at 03:02. Officer Scherle had safety concerns based on Barrientos's behavior and gang or prison tattoos. Officer Scherle later told Officer Fleckenstein that Barrientos's behavior was freaking him out. Ex. C at 06:47. Once Officer Clark had exited his vehicle and come to the driver's side window, Officer Scherle said, "I tell you what, Omar, just do me a favor, just hop out and keep your hands where I can see them, okay?" Ex. C at 03:10 to 03:59. Officer Scherle directed Barrientos to place his hands on the vehicle so he could conduct a pat-down search (Barrientos was slow putting his hands on the Accord when asked). *Id.*; Ex. B at 08:57. Officer Scherle found no weapons or contraband and told Barrientos to wait with his hands on the car (he was again slow to do so) and then go sit on the front bumper of Officer Fleckenstein's vehicle with Officer Clark standing by. Ex. B at 10:40; Ex. C at 03:58 to 05:11. Officer Scherle went back to the Accord and looked in the passenger side (the doors were closed and windows up). Ex. C at 05:13. He saw a sleeve of pills in the center console area, which he believed could be the cause of Barrientos's impairment, either prescription or illegal narcotics. The pills were in a silver foil blister pack and appeared to be commercially packaged. Officer Scherle opened the front passenger door and picked up the pill sleeve. Ex. B at 11:07; Ex. C at 05:28. Upon seeing they were caffeine pills, he tossed them onto the passenger seat of the car and stepped back, continuing to peer into the car's open door with his flashlight for a few seconds. Ex. C at 05:30; Ex. A at 07:00. Although Officer Scherle

4

testified at the suppression hearing that he shut the door after returning the pills, the video exhibits show he walked around to the driver's side of the Accord without shutting the passenger side door. Ex. B at 11:25.

Officer Scherle peered into the open driver's side window with his flashlight for a few seconds before indicating he saw a "crystalline substance on the driver's side floorboard" he believed to be methamphetamine. Ex. C at 05:49. Neither Officers Fleckenstein nor Clark saw it prior to this, even though both had been at the driver's side window. Officer Fleckenstein had been at the driver's side window only when first engaging with Barrientos, and he acknowledged on scene that he was "focused on [Barrientos]" and "didn't even see" the shards of methamphetamine. *See* Ex. A at 06:56-07:01, 07:11:30. Officer Clark had peered through the open driver's side window without a flashlight for about fifteen seconds while Officer Scherle was questioning Barrientos (when the passenger door was still closed). Ex. B at 07:32-07:46.

Officer Scherle went to his vehicle to get a field test kit. Ex. B at 11:41. As Officer Scherle went back to the Accord, Officer Fleckenstein returned. Ex. B at 12:00; Ex. C at 06:28. Officer Scherle opened the driver's side door of the Accord, and the white substance can be clearly seen on the body camera video, along the edge of the foot mat (both doors were open at this time). Ex. C at 7:18. The substance tested positive for methamphetamine. Officer Scherle then began searching the vehicle for drugs and almost immediately found suspected methamphetamine under the front passenger seat. Ex. B at 13:00; Ex. C at 07:19 to 07:25. After that, Officer Scherle placed Barrientos under arrest.

Doc. 45 at 2-7 (footnotes omitted).

### B. *The Parties' Arguments*

Barrientos does not challenge the initial encounter with Fleckenstein, but argues the situation transitioned to an unlawful detention when additional officers arrived and the encounter was unreasonably prolonged. Doc. 45 at 7. He also challenges the search of the vehicle, arguing the caffeine pills were not plainly incriminating and that opening the passenger door to retrieve them tainted the subsequent plain-view search based on Scherle seeing methamphetamine near the driver's floor mat. *Id*.

The Government argues the officers developed reasonable suspicion of criminal activity during the encounter based on their observations and interaction with Barrientos, including a plain view observation of a white crystalline substance. Thus, it argues the officers were justified in extending the scope of the inquiry and Barrientos' detention. The Government also argues that the search of the pills was lawful based on the officers' observations of Barrientos (indicating possible intoxication). It contends that the second search of the vehicle was justified after Scherle observed, from the outside of the vehicle, a white crystalline substance in plain view. When that substance tested presumptive positive for methamphetamine, the Government argues officers then had probable cause to search the entire vehicle.

## C.     *Recommendations*

Judge Mahoney recommends rejecting Barrientos' argument that he was unlawfully seized in violation of the Fourth Amendment because officers were acting pursuant to their community caretaking function to ensure that a suspected impaired individual did not pose a danger to himself or others. Doc. 45 at 9-11. She also recommends rejecting Barrientos' argument that any illegality in opening the passenger door to seize the caffeine pills requires suppression of the later-discovered methamphetamine. Judge Mahoney concluded it was unnecessary to resolve the reasonableness of the search of the caffeine pills because even if unlawful, the independent-source or inevitable-discovery doctrine applied to the subsequent search based on the plain view observation of the methamphetamine. Doc. 45 at 13-16. As such, Judge Mahoney recommends denying Barrientos' motion to suppress.

## III. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

7

## IV. DISCUSSION

### A. Barrientos' Objections

Barrientos objects to the following conclusions:

1. The seizure of his person by law enforcement was lawful

2. Any prolonged detention was permitted by the officers performing a caretaking function

3. The search of his vehicle was proper

4. The illegal search of the passenger side of his vehicle did not act to exclude the subsequent examination and search of the driver's side

5. The independent source rule acted as an exception to exclusion of evidence.

6. The inevitable discovery rule acted as an exception to the exclusion of evidence.

Doc. 48 at 2. I will discuss his first two objections related to the seizure of his person followed by the remaining objections related to the search of his vehicle.

### B. Analysis

#### 1. Seizure

Barrientos argues that there was a seizure based on the factors set out in *United States v. Griffith*, 533 F.3d 979 (8th Cir. 2008). Specifically, he argues his freedom of movement was restricted, three officers were present, officers directed his movements and had physical contact with him, turning the initial lawful encounter into an unlawful seizure. He contends that if the officers were truly performing a community caretaking function, they could have simply asked Barrientos if he had a cell phone or if there was someone he could call to give him a ride or request a cab or Uber. Barrientos also argues that the purported reasonable suspicion of intoxication or impairment was insufficient to prolong the stop because none of the officers followed through with that investigation by conducting field sobriety tests to determine if Barrientos was in fact intoxicated.

8

Because the R&R recognized that Barrientos had not otherwise committed any actionable offense, such as public intoxication or trespass, he argues the officers' prolonged detention was unreasonable. He argues that the *Griffith* factors are not secondary to any detention necessary for public caretaking and that even if officers were performing a caretaking function, it was not necessary to remove Barrientos from the vehicle to investigate the possible source of any believed intoxication. Finally, he contends that the subsequent search of the vehicle would not have happened absent the prolonged detention and therefore the unlawful seizure justifies suppression of all items recovered from the search as well.

The Eighth Circuit has recognized that noninvestigatory searches and seizures may be justified pursuant to the "community caretaking" aspect of law enforcement. *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014). "Community caretaking" has been described as those activities that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). This includes seizing a citizen "in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001). The Eighth Circuit has stated:

> Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference.

*Id.* at 767. "The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless of course, the officer obtains further reason to justify the stop." *Harris*, 747 F.3d at 1017 (citing *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005)).

9

Based on my de novo review, I agree with Judge Mahoney that any prolonged detention of Barrientos and seizure of his person was reasonable pursuant to the community caretaker function.[2] The evidence demonstrates that upon Scherle's arrival, Fleckenstein went to his patrol vehicle and started looking up information on his computer, including attempting to find someone to come pick up Barrientos. *See* Doc. 50 at 11. While he did this, Scherle spoke with Barrientos, during which he made several observations[3] that gave him concern about having Barrientos remain in the vehicle with any "unknown dangers." Doc. 50 at 46. Scherle asked Barrientos to step out of the vehicle[4] and grabbed the caffeine pills packet from inside the vehicle. By the time Fleckenstein was finished in his patrol vehicle,[5] Scherle had made his plain view observation from outside the vehicle at the driver's window and was getting ready to test the crystalline substance. While there were certainly other options Fleckenstein could have pursued in determining how to remove Barrientos from the property, his decision to try to find a third party who could give Barrientos a ride was not unreasonable, particularly given his prior discussion with Barrientos during which Barrientos gave unintelligible answers. Barrientos' objections related to the seizure of his person are overruled.

---

[2] I do not find an analysis of the *Griffith* factors to be necessary because, like the R&R, I assume there was a seizure, but find that it was reasonable pursuant to the community caretaker function.

[3] Scherle testified Barrientos was making a lot of furtive movements inside the vehicle, fidgeting, had uncontrolled gestures with his hands, twitching and sweating profusely which, based on Scherle's training and experience indicated narcotics abuse. Doc. 50 at 46-47. He also noticed some tattoos that he believed were either prison tattoos or had some gang relation. *Id*.

[4] This was not unreasonable based on Scherle's observations. *See United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) ("During a *Terry* stop, officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." (cleaned up)).

[5] Exhibit A shows that from the time Scherle arrived to the time Fleckenstein was finished in his patrol vehicle was approximately six minutes.

## 2. Search

Barrientos argues that the search of his vehicle was not necessary nor connected to any investigation regarding the source of his perceived impairment. He contends officers had no authority to search for the source of any intoxicating substance and there was no other crime that officers could have been investigating. He contends it was unlawful for Scherle to open the passenger door and seize the caffeine pills as it was not "immediately apparent" they were contraband. He also challenges the idea that there were two searches independent of each other. With regard to the independent-source and inevitable-discovery doctrines, Barrientos argues there is nothing to suggest that the discovery of the methamphetamine was inevitable. Because officers were purportedly holding Barrientos under a caretaking function to assist him in getting home, he contends there was no reason for them to search or continue searching his vehicle. Thus, he argues that once he was removed from the vehicle, there was no reason to search the interior of the vehicle. He further argues that, in any event, it was not "inevitable" that the methamphetamine would be found, as that side of the vehicle had already been viewed by two officers who found nothing. Finally, Barrientos argues that there was not an independent source that led to discovery of the methamphetamine because nothing occurred between the illegal entry through the passenger side and the subsequent exterior search that would support any new probable cause. He contends that any search of the vehicle after he was removed was unlawful, as it was done without probable cause or articulable suspicion.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (plurality opinion) (quotation omitted). One of those exceptions is the plain view doctrine. *Id.* at 465-68. "For the plain view doctrine to apply, not only must the officer be legitimately in a position to view the object, but it must be immediately apparent to the police that they have evidence before them." *Texas*

11

*v. Brown*, 460 U.S. 730, 736 (1983). I agree with Judge Mahoney that it is unnecessary to resolve the reasonableness of the first search into the interior of the vehicle (when Scherle opened the passenger door to grab the caffeine pills) because Barrientos does not seek to suppress any evidence discovered as a result of that search.[6] In addition, the search was permissible under the independent-source or inevitable-discovery doctrines.

"The independent-source doctrine applies if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact *was* acquired (or reacquired) by these lawful means." *United States v. Baez*, 983 F.3d 1029, 1037 (8th Cir. 2020). "The inevitable-discovery doctrine, on the other hand, applies if the evidence would have been acquired by lawful means had the unlawful search not occurred but in fact *was not* acquired (or reacquired) by these lawful means." *Id*. The principle behind these doctrines is "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Id*. (quoting *Murray v. United States*, 487 U.S. 533, 539 (1988)). The admissibility obtained after a constitutional violation requires the Government to show that it was not obtained "by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *McManaman*, 673 F.3d at 846. The Government must establish "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id*. (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "Under the independent source doctrine, the exclusionary rule is inapplicable where the evidence was acquired through a source

---

[6] Barrientos does not argue the methamphetamine was discovered during this search of the vehicle and there is no evidence in the record supporting such. I also reject his argument that Scherle's actions can be viewed only as one continuous search of the vehicle. The difference in the space Scherle occupied during the two searches is sufficient to distinguish them because one (the exterior of the vehicle) was constitutionally-permissible and the other (inside the vehicle) was likely not. As discussed below, the relevant question is whether the evidence Barrientos seeks to suppress was obtained by exploitation of the illegal search or "by means sufficiently distinguishable to be purged of the primary taint." *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

12

independent of the tainted search." *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013).

Based on my de novo review, I agree with Judge Mahoney that the search leading to the discovery of methamphetamine was reasonable based on the plain view doctrine and independent-source or inevitable-discovery doctrine. After Scherle obtained the caffeine pills from inside the vehicle, he realized they were not contraband and returned to the constitutionally-permitted space outside the vehicle. Scherle walked outside of the vehicle, looking inside. Outside the driver's window, he used his flashlight to assist him in looking into the interior of the vehicle. This did not infringe on any Fourth Amendment right. *See Brown*, 460 U.S. at 739-40 (stating that officer's "action in shining his flashlight to illuminate the interior of [Evans's] car trenched upon no right secured to the latter by the Fourth Amendment"). At this time, he made the plain view observation of the crystalline substance on the floorboard. Because he was in a constitutionally-permitted space when he made this observation, and its incriminating character was immediately apparent, the search and seizure was lawful. *See United States v. Class*, 883 F.3d 734, 7737 (8th Cir. 2018) ("Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993))).

While Fleckenstein and Clark had also been outside the driver's window and had the opportunity to look inside the vehicle, the fact that they did not make the same observation as Fleckenstein does not impact the legitimacy of Fleckenstein's observation. Because the search leading to the discovery of the methamphetamine was independent of the search of the interior of the vehicle, and was permissible based on Scherle's plain view observation from the exterior of the vehicle, it did not violate the Fourth Amendment. Barrientos' objections to the search of the vehicle that resulted in the discovery of the methamphetamine are overruled.

## V.   CONCLUSION

For the reasons set forth herein:

1. Barrientos' objections (Doc. 48) to the Report and Recommendation (Doc. 45) are **overruled**;

2. I **accept** the Report and Recommendation (Doc. 45) without modification;

3. Pursuant to the Report and Recommendation, Barrientos' motion (Doc. 38) to suppress evidence is **denied**.

**IT IS SO ORDERED** this 12th day of May, 2025.

_____
Leonard T. Strand
United States District Judge